IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Knoxville October 15, 2013

## STATE OF TENNESSEE v. MECHELLE L. MONTGOMERY

**Appeal from the Circuit Court for Williamson County**
**No. IICR076574     James G. Martin, III, Judge**

_____

**No. M2013-01149-CCA-R3-CD - Filed March 12, 2014**

_____

The Defendant-Appellee, Mechelle L. Montgomery, was indicted for driving under the influence of an intoxicant and for violation of the open container law. See T.C.A. §§ 55-10-401, -416. She filed a motion to suppress, alleging, inter alia, that she was unreasonably seized and that her arrest lacked probable cause. After a bifurcated hearing on the motion, the trial court took the matter under advisement and requested further briefing from the parties. The trial court subsequently entered a written order granting Montgomery's motion to suppress. The State appeals, arguing that the trial court erred in concluding that the investigatory detention of Montgomery was unlawful. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed.**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., J., joined. JEFFREY S. BIVINS, J., filed a separate dissenting opinion.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Kim R. Helper, District Attorney General; and Carlin C. Hess, Assistant District Attorney General, for the Appellant, State of Tennessee.

Lee Ofman, Franklin, Tennessee, for the Defendant-Appellee, Mechelle L. Montgomery.

## OPINION

On July 9, 2012, the Williamson County Grand Jury indicted the Defendant-Appellee, Mechelle L. Montgomerty, for driving under the influence (DUI) and violation of the open container law. On September 19, 2012, Montgomery filed a motion to suppress the evidence, followed by an amended motion on January 22, 2013. In her motion, she argued, inter alia, that Deputy David Reiman did not have reasonable suspicion to stop and detain her. The trial

court conducted a bifurcated hearing on the motion on October 30, 2012, and on January 23, 2013. Deputy Reiman was the only witness in these proceedings.

**October 30, 2012 Suppression Hearing.** Deputy David Reiman of the Williamson County Sheriff's Office testified that he had worked in his current capacity since June 2009. Prior to that, he was employed by the Pinal County Sheriff's Office in southern Arizona. Deputy Reiman initially received his DUI enforcement training in Arizona in September 2007 and estimated that he has since made several dozen DUI arrests. Through his training and experience, Deputy Reiman was familiar with the administration of field sobriety tests.

Deputy Reiman testified that he was on patrol on the afternoon of February 12, 2012. At around 3:00 p.m. he was serving as back-up to Deputy Chris Shoap in response to an "unwanted subject" call. Deputy Reiman did not hear the actual 911 call between the citizen and the dispatcher, but was responding to a call that was fielded by the dispatcher over the radio. He gleaned the following information from the dispatcher's call for service:

> A female caller had contacted the emergency operations center and indicated that the ex-girlfriend of her current boyfriend was at their place of residence on Trinity Road and had been harassing the complainant and her boyfriend in the past, and she feared that there was going to be a conflict.

The caller, who had identified herself as Corey Brown, reported that she and her boyfriend had driven by their residence and observed a black Ford Mustang in their driveway. They left the area and called the Sheriff's Office. The dispatcher also notified Deputy Reiman that the subject driving the vehicle should be Mechelle Montgomery and that the caller believed Montgomery was intoxicated based on a conversation with her.

While Deputy Reiman and Deputy Shoap were en route in separate vehicles to the residence at 125 Trinity Road, they observed a black Ford Mustang with two women in it in the parking lot of a church at 147 Trinity Road. They agreed that Deputy Shoap would continue to the residence and that Deputy Reiman would investigate the vehicle in the church parking lot. Deputy Reiman testified that his purpose was to determine whether the driver of the Mustang was the individual involved in the "unwanted subject" call. He pulled into the church parking lot and purposefully parked to the side behind the Mustang so as to not block the vehicle's exit or to improperly detain the occupants in the event that they were not the subjects of the 911 call. He did not initiate his blue lights. Deputy Reiman drew a diagram for the court depicting the scene and the position of the vehicles in reference to one another. The diagram was entered into evidence without objection.

-2-

After exiting his vehicle, Deputy Reiman approached the driver side window of the Mustang and identified himself. He asked if either of the women were Mechelle Montgomery, and the driver said that she was Mechelle. During his initial conversation with Ms. Montgomery, Deputy Reiman "detect[ed] an odor of alcohol being emitted from the passenger compartment of the vehicle and [which] appeared to be coming from her person." He asked Montgomery about the odor but did not recall her response. He then requested, and received, identification from both Montgomery and her passenger. He kept their driver's licenses until Deputy Shoap arrived. Deputy Reiman said that he "did notice that [Montgomery's] speech was slightly slurred, her eyes did appear to be watery." He did not administer field sobriety tests. Deputy Shoap arrived at the scene and conducted the field sobriety tests after concluding his investigation at the initial residence. Deputy Reiman said that Deputy Shoap then asked Montgomery to sit in the back of his patrol vehicle where she remained without handcuffs. According to Deputy Reiman, Montgomery was under arrest and not free to leave at this point. The deputies then conducted a search incident to arrest. Deputy Shoap had detected an odor of burnt marijuana in the Mustang and Deputy Reiman initiated a search of the vehicle after detecting the odor as well. Deputy Reiman said he located ashes and what appeared to be a white, hand-rolled marijuana cigarette under the floor mat on the passenger side. The cigarette contained green leafy marijuana. Deputy Reiman further recalled that Deputy Shoap had observed a Burger King cup in the center console of the vehicle which appeared to contain alcohol. Deputy Reiman said he did not, at any point, read Montgomery her Miranda rights. He agreed that these events occurred in Williamson County.

On cross-examination, Deputy Reiman said he answered the same radio as Deputy Shoap, and that he frequently backed him up. He estimated that he was in the parking lot with the women for ten to fifteen minutes before Deputy Shoap arrived. He said he smelled alcohol from the passenger compartment of the vehicle, but he did not see any alcohol at this point. Deputy Reiman testified that he did not know whether there was any criminal activity afoot, but that there was an allegation, based on the 911 call, "that there was an unwanted subject, a possible trespassing." He never went to 125 Trinity Road to investigate the possible trespassing but testified that "[he] was acting in good faith" when he detained the women. He said that an unwanted subject call can be, but is not always, a criminal matter. The proceedings were continued when the defense realized that video and audio of the incident from Deputy Reiman's vehicle had not been produced in discovery.

**January 23, 2013 Suppression Hearing.** Deputy Reiman testified that when he made contact with the two women in the Mustang, the engine was running and the keys were in the ignition. While speaking with Montgomery, he observed the following:

I was uncertain exactly whom [the odor of alcohol] was coming from, but from my experience, and [Montgomery's] slurred speech, watery eyes, I made an inference that it could be possibly her that was - - had been consuming alcohol.

At this point, Deputy Reiman "had formulated suspicion" that Montgomery had committed the offense of DUI. After making this determination, he did not ask Montgomery to exit the vehicle. To his knowledge, the "unwanted subject" investigation was ongoing, so he waited for Deputy Shoap to arrive from the residence at 125 Trinity Road because it was his call. Once Deputy Shoap was at the scene, Deputy Reiman informed him of his observations, including that he had smelled what he believed to be alcohol inside the vehicle and about Montgomery's mannerisms. After Montgomery exited the vehicle, Deputy Shoap proceeded to conduct field sobriety tests in the church parking lot while Deputy Reiman observed. Deputy Reiman was approximately twenty to twenty-five feet from Montgomery during this time. After the tests were administered, Montgomery was seated in the rear of Deputy Shoap's patrol car. Deputy Reiman testified that he had viewed the video of Montgomery performing the field sobriety tests and that it was an accurate representation of what took place. The video was entered into evidence and played for the court. Based on his viewing, Deputy Reiman concluded that, as a whole, "[Montgomery] did not do well."

On cross-examination, Deputy Reiman acknowledged that he had relied partly on Deputy Shoap's incident report to refresh his memory during his direct testimony as to Montgomery's performance on the field sobriety tests. The report was marked and entered into evidence. Deputy Reiman agreed that after he introduced himself and confirmed that one of the women was Montgomery, he kept both of the driver's licenses in his possession until Deputy Shoap arrived. He could not recall or estimate how long it took for Deputy Shoap to arrive, but he agreed that he told the women, "[W]e're going to hang out here for a little bit[.]" Deputy Reiman testified that he retained the licenses because he was investigating a possible trespass at the time, and that his information was based on the 911 call fielded from dispatch. He agreed that Montgomery was cooperative, and he could not recall if he noticed a cup in the console at that time. He did not recall ascertaining to whom the cup belonged or how long it had been there. Prior to the field sobriety tests conducted by Deputy Shoap, Deputy Reiman "simply had [his] observation of [Montgomery's] slurred speech and the odor of alcohol." He thought that Montgomery had possibly committed a DUI, but he was not convinced while she remained in her vehicle. Deputy Reiman said that, when he first made contact with Montgomery in the church parking lot, she was not free to leave because he was investigating a possible trespass, which may or may not be a crime depending on the circumstances. He did not recall if Montgomery showed him a text message from her ex-boyfriend inviting her to his residence. He agreed that Montgomery mentioned having nerve damage that affected her speech and her balance. Deputy Reiman

reiterated that this was not his arrest. Deputy Shoap did not testify at the suppression hearing.

The trial court took the matter under advisement and requested further briefing from the parties in support of their respective arguments. On April 4, 2013, the trial court entered a written order finding that Montgomery was seized in violation of her constitutional rights and granted her motion to suppress. In its conclusions of law, the trial court noted, in pertinent part:

> Deputy Reiman approached Ms. Montgomery for the specific purpose of determining whether the vehicle in the church parking lot was being operated by a "Mechelle Montgomery," the subject of the unwanted person call. After the driver responded that she was, in fact, Mechelle Montgomery, Deputy Reiman asked the driver and the passenger for identification. Both of them provided Deputy Reiman with their driver's licenses. Deputy Reiman retained the driver's license of Ms. Montgomery and the passenger after telling Ms. Montgomery of the 911 call which had been received. With Ms. Montgomery's license in his possession, Deputy Reiman advised Ms. Montgomery, "[w]e are going to hang out here for a little bit." It was Deputy Reiman's intent to wait until Deputy Shoap completed his investigation and arrived at the church parking lot. The Court does not know how much time passed between the initial encounter between Deputy Reiman and Ms. Montgomery and the arrival of Deputy Shoap, whether it was ten (10) or fifteen (15) minutes, or a shorter time or a longer time. However, the length of passage of time is irrelevant. Ms. Montgomery was not free to leave. Even though her vehicle may not have been blocked by the position of Deputy Reiman's vehicle, Deputy Reiman was in possession of Ms. Montgomery's driver's license and Deputy Reiman had told Ms. Montgomery, were [sic] "going to hang out here for a little bit."
>
> . . . .
>
> When he seized Ms. Montgomery, Deputy Reiman had available to him the information which had been relayed by the 911 dispatcher regarding an "unwanted person." The information was allegedly attributable to the girlfriend of Ms. Montgomery's former boyfriend which, on its face, would have questionable merit. Deputy Reiman observed at the time of his encounter with Ms. Montgomery that she was seated in the driver's side of the vehicle, the engine to the vehicle was running, her speech was slightly slurred, and she had watery eyes. Based upon the information available to him, including his

observations of Ms. Montgomery and the totality of the circumstances, Deputy Reiman elected not to further investigate, e.g., conduct field sobriety tasks, or charge Ms. Montgomery with a criminal offense. Instead, he elected to wait until Deputy Shoap arrived, communicate his observations to Deputy Shoap, and let Deputy Shoap make whatever decision Deputy Shoap deemed appropriate. As a consequence, Deputy Reiman did not make a brief investigatory detention based on information available to him. His decision was to hold Ms. Montgomery until Deputy Shoap arrived, however long that might take, and allow Deputy Shoap to conduct the investigation since it was "Deputy Shoap's stop."

. . . Because Deputy Shoap did not testify, the basis for his decision cannot be discerned by the Court without speculation. However, Deputy Reiman's seizure of Ms. Montgomery and his holding her for the arrival of Deputy Shoap was without lawful authority.

Based on the Tennessee Supreme Court's recent analysis in State v. James David Moats, [403 S.W.3d 170 (Tenn. 2013),] the Court concludes that Deputy Reiman's seizure of Ms. Montgomery was unlawful and all evidence received thereafter should be suppressed.

It is from this order that the State now timely appeals.

## ANALYSIS

On appeal, the State argues that the trial court erred in concluding that the investigatory detention of Montgomery was unlawful. Specifically, the State asserts that it was not unreasonable for Deputy Reiman to wait for Deputy Shoap to arrive because the investigation of the trespassing complaint was ongoing. The State further maintains that it was "objectively reasonable" for Deputy Reiman to wait for Deputy Shoap's assistance in conducting the DUI investigation. While conceding that Deputy Reiman seized Montgomery once he took her identification and detained her, the State contends that his decision to delay the DUI investigation did not make the seizure illegal. In response, Montgomery argues that the trial court properly concluded that she was seized in violation of her constitutional rights. In support of this conclusion, Montgomery asserts that Deputy Reiman did not have reasonable suspicion based on specific and articulable facts that a crime had been or was about to be committed. She also argues that Deputy Reiman did not diligently pursue a means of investigation that was likely to confirm or dispel his suspicions quickly. Upon review, we affirm the judgment of the trial court.

It is well-established that "'a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.'" State v. Cox, 171 S.W.3d 174, 178 (Tenn. 2005) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. The prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Id. However, this court's review of a trial court's application of the law to the facts is de novo with no presumption of correctness. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (citing State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)).

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals from unreasonable searches and seizures.[1] See U.S. Const. amend IV; Tenn. Const. art. 1, § 7. These constitutional protections are designed to "'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998) (quoting Camara v. Mun. Court, 387 U.S. 523, 528 (1967)). "The touchstone of the Fourth Amendment is reasonableness." Florida v. Jimeno, 500 U.S. 248, 250 (1991). "'[A]rticle I, section 7 is identical in intent and purpose with the Fourth Amendment[.]'" State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting Sneed v. State, 221 Tenn. 6, 13, 423 S.W.2d 857, 860 (1968)). However, the Tennessee Supreme Court has noted that Tennessee's decisions applying search and seizure law are slightly more restrictive than federal law. State v. Richards, 286 S.W.3d 873, 877-78 (Tenn. 2009) (citing State v. Lakin, 588 S.W.2d 544, 549 (Tenn. 1979)). "[A] warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the

---

[1] The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article 1, Section 7 of the Constitution of Tennessee guarantees:

That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." Yeargan, 958 S.W.2d at 629 (citing Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); State v. Bartram, 925 S.W.2d 227, 229-30 (Tenn. 1996)).[2]  The State has the burden to establish by a preponderance of the evidence that a warrantless search or seizure is constitutional.  See, e.g., State v. Simpson, 968 S.W.2d 776, 780 (Tenn. 1998).

Not all police-citizen encounters implicate constitutional protections.  See, e.g., State v. Nicholson, 188 S.W.3d 649, 656 (Tenn. 2006).  The Tennessee Supreme Court has recognized three tiers of interactions between law enforcement and private citizens: "(1) a full scale arrest which must be supported by probable cause; (2) a brief investigatory detention which must be supported by reasonable suspicion; and (3) brief police-citizen encounters which require no objective justification."  State v. Daniel, 12 S.W.3d 420, 424 (Tenn. 2000) (citations omitted).  Of these categories, "only the first two rise to the level of a 'seizure' for constitutional analysis purposes."  State v. Day, 263 S.W.3d 891, 901 (Tenn. 2008).  "[W]hat begins as a consensual police-citizen encounter may mature into a seizure of the person."  Daniel, 12 S.W.3d at 427.  A seizure occurs "'when the officer, by means of physical force or show of authority,  has in some way restrained the liberty of a citizen.'"  Id. at 901-02 (quoting Terry v. Ohio, 392 U.S. 1 at 19 n. 16).  The relevant inquiry is "whether, 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed he or she was not free to leave.'"  State v. Randolph, 74 S.W.3d 330, 336 (Tenn. 2002) (quoting Daniel, 12 S.W.3d at 425).  The supreme court has previously held that a consensual encounter may amount to a seizure when the officer retains the citizen's driver's license, because a reasonable person would not leave without his or her identification.  Daniel, 12 S.W.3d at 427.  In addition, the "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure[.]'"  Whren v. United States, 517 U.S. 806, 809-10 (1996); see also State v. Vineyard, 958 S.W.2d 730, 734 (Tenn. 1997).  The police must have either probable cause or reasonable suspicion at the time the individual is seized.  See, e.g., Randolph, 74 S.W.3d at 338.  Whether reasonable suspicion existed in a particular case is a fact-intensive and objective analysis.  State v. Garcia, 123 S.W.3d 335, 344 (Tenn. 2003).

As relevant to the instant case, one well-established exception to the warrant requirement is a brief investigatory stop or detention based upon "a reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed."  State v. Bridges, 963 S.W.2d 487, 492 (Tenn. 1997) (citing Terry v. Ohio, 392

---

[2] Well-settled exceptions to the warrant requirement include searches and seizures incident to a lawful arrest, those based on consent, those conducted in "plain view," "hot pursuit" of a fleeing suspect, "exigent circumstances," and those based on "reasonable suspicion" of criminal activity.  See State v. Cox, 171 S.W.3d 174, 179 (Tenn. 2005).

U.S. 1 at 21). The Tennessee Supreme Court recently summarized the law regarding reasonable suspicion:

> Reasonable suspicion must be supported by more than the officer's "inchoate and unparticularized suspicion or 'hunch,'" Terry, 392 U.S. at 27; however, "'reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause . . . [and] can arise from information that is less reliable than that required to show probable cause.'" State v. Pulley, 863 S.W.2d 29, 32 (Tenn. 1993) (quoting Alabama v. White, 496 U.S. 325, 330 (1990)); see also Day, 263 S.W.3d at 903.

> Trial courts must examine the totality of the circumstances when evaluating whether an officer has established the requisite level of suspicion to justify a Terry stop. Binette, 33 S.W.3d at 218. These circumstances include an officer's observations, information from other law enforcement personnel or agencies, information from citizens, known patterns of criminal offenders, or deductions based upon experience. State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992). When evaluating the reasonableness of the police officer's suspicion, the nature of the crime suspected may be a factor. See State v. Winn, 974 S.W.2d 700, 703 (Tenn. Crim. App. 1998) ("A frisk has been upheld as reasonable when the suspected crime might typically involve the use of a weapon . . . [such that] an officer [may] reasonably infer that a weapon might be in the possession of the suspect.").

State v. Moats, 403 S.W.3d 170, 178-79 (Tenn. 2013).

The determination of whether a seizure and search were unreasonable is a twofold inquiry. Terry, 392 U.S. at 19-20. The officer's actions must be "justified at its inception" and the actions must be "reasonably related in scope to the circumstances which justified the interference in the first place." Id. Even when an initial stop or seizure is constitutionally valid, the resulting investigatory detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325 (1983). An otherwise reasonable stop may become unreasonable "'if the time, manner or scope of the investigation exceeds the proper parameters.'" State v. Troxell, 78 S.W.3d 866, 871 (Tenn. 2002) (quoting United States v. Childs, 256 F.3d 559, 564 (7th Cir.2001)); see also State v. Morelock, 851 S.W.2d 838, 840 (Tenn. Crim. App. 1992). There is no bright-line rule in determining whether an investigative stop is unreasonable in duration. See United States v. Sharpe, 470 U.S. 675, 685 (1985). "[T]he proper inquiry is whether during the detention, the police diligently pursued a means of investigation that was likely to

confirm or dispel their suspicions quickly." State v. Simpson, 968 S.W.2d 776, 783 (Tenn. 1998).

Here, the State does not dispute that Montgomery was seized when Deputy Reiman retained her driver's license and said, "[W]e're going to hang out here for a little bit[.]" See also Daniel, 12 S.W.3d at 426 (concluding that police may approach an individual in a public place, or in a parked car, and ask questions without implicating constitutional protections, but that a "seizure" occurs if an officer retains the individual's identification). According to Deputy Reiman's testimony, he retained the licenses of Montgomery and her passenger because an "unwanted person" investigation was ongoing. At the moment he seized Montgomery, Deputy Reiman had also detected an odor of alcohol and observed that her speech was slurred. For the reasons that follow, we conclude that Deputy Reiman unreasonably seized Montgomery. See Simpson, 968 S.W.2d at 783.

Deputy Reiman testified that once he confirmed the identity of Montgomery, she was not free to leave because he was investigating a possible "unwanted person" call. He also acknowledged that the nature of such an investigation may not be criminal. At the initial suppression hearing on October 30, 2012, Deputy Reiman estimated that Deputy Shoap arrived ten to fifteen minutes after Deputy Reiman initially made contact with Montgomery. At the January 23, 2013 hearing, Deputy Reiman could not recall how long it took for Deputy Shoap to arrive. The trial court therefore did not make any finding of fact regarding the duration of the detention. The State asserts that the police diligently pursued the "unwanted person" investigation because Deputy Shoap was interviewing the 911 caller and her boyfriend at the time that Deputy Reiman seized Montgomery. Even so, the record fails to show that Deputy Reiman made any efforts to confirm or dispel his suspicions regarding the complaint of an "unwanted person" or a DUI offense. As the deputies were en route to the subject residence, they observed Montgomery's vehicle in a nearby church parking lot. Because Deputy Reiman confirmed that the subject of the complaint was inside the parked car and not at the residence of the complainant, it is questionable at this point whether reasonable suspicion supporting the "unwanted person" call continued to persist. Nevertheless, Deputy Reiman took Montgomery's driver's license and told her they were going to "hang out here for a bit." Deputy Reiman testified that he was trained in DUI enforcement and that he had made several dozen DUI arrests. Upon detecting the odor of alcohol, he did not ask Montgomery to exit her vehicle or administer any field sobriety tests. Apart from detaining Montgomery, it is unclear from the record what, if anything, Deputy Reiman did to investigate.

The State insists that the delay in the DUI investigation "was within the bounds of constitutional reasonableness." We disagree. This court has previously held that, while insufficient to establish probable cause for a DUI arrest, the odor of alcohol alone is sufficient

-10-

to "establish the right of the officer to briefly detain the defendant at the scene and administer field sobriety tests or otherwise ascertain defendant's state of sobriety." State v. Jashua Shannon Sides, No. E2000-01422-CCA-R3-CD, 2001 WL 523375, at *3 (Tenn. Crim. App. May 16, 2001) (citing State v. Yeargan, 958 S.W.2d 626, 633 (Tenn.1997)). Here, Deputy Reiman detected an odor of alcohol and observed that Montgomery had slurred speech and watery eyes. Rather than quickly confirming or dispelling his suspicions, Deputy Reiman waited for Deputy Shoap to arrive because "this was [his] call." Although the State argues that it was "objectively reasonable" for Deputy Reiman to wait for Deputy Shoap's assistance in conducting the DUI investigation, there is no testimony in the record or finding of fact to establish that Deputy Reiman required assistance. Reasonable circumstances that justify a delay in conducting similar investigations involve officers who detect the smell of alcohol, continue to direct traffic after a concert, and later request the assistance of an investigating officer, see State v. David L. Groom, No. M2002-00798-CCA-R3-CD, 2003 WL 1563667 (Tenn. Crim. App. Mar. 27, 2003), or where an officer detained the defendant for the purpose of a trained DUI unit/officer to arrive and administer sobriety tests. See, e.g., State v. Harry Richard, No. W2008-02458-CCA-R3-CD, 2010 WL 1462547 (Tenn. Crim. App. Apr. 13, 2010). No such circumstances are apparent from the facts of this case. Because Deputy Reiman did not investigate the possible DUI, despite having the training and opportunity to do so, we agree with the trial court, and conclude that the State has not met its burden in demonstrating that Montgomery's detention was reasonable.

Based on the record, we conclude that the State has failed to meet its burden of establishing by a preponderance of the evidence that it was reasonable for Deputy Reiman to detain Montgomery without investigating either the possible trespassing or the suspected DUI. Accordingly, Montgomery was subjected to an unreasonable seizure and all evidence discovered thereafter should be suppressed. See Yeargan, 958 S.W.2d at 629. The trial court properly granted the motion to suppress in this case.

## CONCLUSION

Upon review, we affirm the judgment of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE